CLAIROL, INCORPORATED, Plaintiff-Appellee, *v.* ANDREA DUMON, INC. *et al.*, Defendants-Appellants.

(No. 55514;

First District (2nd Division)—June 12, 1973.

*Rehearing denied October 31, 1973.*

Esther O. Kegan, David Chaimovitz, and Seymour F. Simon, all of Chicago, for appellants.

Alfred T. Lee, of New York, N.Y., and Paul Noland, of Chicago, (Weil, Lee & Bergin, and Hackbert, Rooks, Pitts, Fullagar & Poust, of counsel,) for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

Plaintiff, Clairol, Inc., filed suit against defendants, Andrea Dumon, Inc., and its president, Bernard Malits, to enjoin distribution of Andrea Dumon "White Creamed Peroxide Developer," charging that the graphics, or "trade dress," on the defendants' container so closely imitated the graphics of plaintiff's "Pure White Creme Developer" that consumer would mistakenly purchase defendants' product in the belief it was plaintiff's.

The trial court permanently enjoined defendants from using plaintiff's trade dress, the court finding it to be colorably similar to plaintiff's. In addition, the court found defendants to have wilfully engaged in a deceptive trade practice, by wilfully simulating plaintiff's trade dress, and, accordingly, assessed against defendants the plaintiff's costs and attorneys' fees.

On appeal defendants contend the provisions of the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1967, ch. 121½, sec. 211 *et seq.*), not pleaded in the complaint, are not applicable to this suit, the trial court's injunctive order is contrary to the law and the evidence; and the trial court's assessment of costs and attorneys' fees is not supported by the findings and is manifestly against the weight of the evidence.

Plaintiff is a well-known manufacturer and marketer of cosmetic products. Its trade name is "Clairol," through which it has established a large and successful business, especially in the sale of products for coloring and treating human hair. In 1958, plaintiff, dissatisfied with the quality of existing hydrogen peroxide products then on the market (used as a preparation along with hair color dyes), decided to market its own peroxide product, calling it "Pure White Creme Developer."

The market for products of this type is divided into two parts: the beauty salon trade and the retail market for sale to the general public. At first, distribution of Clairol's peroxide product was limited to the salon trade, and the original sold in 16 ounce bottles; in 1960, Clairol introduced the product into the retail market for sale to the general public, packaging the retail product in four ounce bottles.

In both the professional salon trade and the retail field, plaintiff's hydrogen peroxide became the leading product of its kind, and, up to 1965, sales of both versions exceeded $15,000,000, representing over 45 million units. The trade dress for both Clairol products is virtually identical, the smaller four ounce bottle graphics being replicas of those employed on the larger 16 ounce item.

Clairol's 16 ounce version was bottled in cylindrical clear glass, seven and one-half inches high, topped with a white plastic cap. When filled, the white color of the bottle's contents provided an opague background

which emphasized the graphic elements printed on the outside of the bottle. Below the bottle's shoulder, Clairol placed a crown design, used on many of its products, and below the crown placed the word "Clairol," in block letters $\frac{3}{16}$ths of an inch high. Below the name "Clairol" was a bar extending horizontally around 60 percent of the bottle's circumference, and beneath the bar were the words "Pure White Creme Developer," in block print $\frac{5}{16}$ths of an inch in height. Descriptive words concerning plaintiff's product made up part of the bottle's format. A color sequence of alternating mustard-gold and black was employed for each element of the design: the crown design in gold; the name "Clairol" in black; a peaked bar in gold, with the words "Pure White" and "Developer" in black; and the word "Creme" in gold. On the back side of the bottle appeared advertising copy and directions for use of the Clairol product.

From 1959 to 1961, defendant Bernard Malits was regional sales manager for plaintiff with responsibility for sales to the retail trade in Illinois and surrounding states. After leaving plaintiff's employ, Malits began business through a corporation, Malits Drug Company, a chain of ten retail stores in Chicago, selling drugs, cosmetics, and related items, which did business under the trade name "Golden Gate."

In 1965, Malits organized defendant Andrea Dumon, Inc., an Illinois corporation, with headquarters in Chicago, and commenced marketing its cosmetic products in retail stores in various parts of the country. Malits was, and is still, the president of Andrea Dumon, Inc.; moreover, he owns most of the corporation's stock.

Sometime late in 1965, defendant corporation initiated plans to market its own cream peroxide product. In determining the trade dress design to be used for the product, one Mr. Zavell, defendants' sales manager, procured a number of sample bottles then being used by other companies, including Clairol's bottle for its "Pure White Creme Developer." Zavell prepared a rough-drawn sketch of what was to be defendants' bottle and trade dress for its 16-ounce capacity product, and submitted the sketch[1] for precise completion, to an artist employed by the corporation.

With respect to the sketch, the court below, as part of its findings of fact, found:

"A visual examination of the sketch discloses that it was copied directly from Clairol's 16 ounce bottle. The sketch closely follows the principal features of Clairol's trade dress, the sequence of

---

[1] Zavell's sketch contained a "peaked" top bar similar to Clairol's; however, the "peaked" bar concept was later changed to a straight line, upon advice of defendants' counsel.

design elements, the size, color and their special relationship(s) to each other. On the sketch are handwritten notations which show instructions that the artist follow the spacing of the bars and other elements of plaintiff's 16 ounce bottle; so that the end product would correspond to the principal features of Clairol's package. Together with this sketch, the artist was given instructions as to the ultimate product he was to complete. * * * From the sketch, and after some changes, the artist completed his art work, and designed the bottle which is the subject of this suit."

Early in 1966, defendant corporation started marketing its peroxide developer in two bottle sizes (a pint size and a five and one-half fluid ounce size), incorporating the graphic design produced from the sketch prepared by Zavell, and from instructions given the artist by defendants.

Defendants' bottle, as produced from their instructions, was also of the stock glass kind, cylindrical, approximately 16 ounces in capacity, and of the same physical configuration as plaintiff's bottle. It differed in some detail at the shoulder, and the bottle's cap was, in height, about twice the size of plaintiff's. At the top of the graphics on the bottle face was an artistic drawing of the Golden Gate Bridge (in mustard-gold), a design reproduced in a size approximating that of Clairol's crown device. Below this design, in plain block letters, appeared the words "Andrea Dumon" (in black), in letters smaller than the Clairol name on plaintiff's 16 ounce bottle. Below "Andrea Dumon" was a bar (in mustard-gold) extending horizontally around 60 percent of the bottle's circumference, and beneath the bar were the words "White (in black) Creamed Peroxide (in mustard-gold) Developer (in black)." And beneath those words, another mustard-gold bar. With the exception of details of little importance, defendants' bottles and trade dress were very similar to plaintiff's.

A visual comparison of the parties' 16 ounce bottles reveals a positive, striking likeness, not only in the respective locations and colors of the crown and bridge designs and the horizontal bars, but in the color schemes and sequences utilized, as well.

## I.

The first question presented is whether the Uniform Deceptive Trade Practices Act is applicable here, as plaintiff's complaint did not plead the statute. The Act was passed in 1965, approved August 5, 1965 (Laws 1965, p. 2647), and became effective January 1, 1966; the statute deals with false, concealing, or deceptive trade identification, and false, confusing, or deceptive representations as to the source or origin of goods.

Although they cite no authority in support of their theory, defendants contend the trial court erroneously relied on the statute, as it had not been charged in the complaint or any subsequent pleading. The trial court held the complaint put defendants on adequate notice of the facts they were required to meet and that the facts, as pleaded, informed defendants of the applicable statutory law.

■■ In *Chase v. Schultz* (1952), 348 Ill.App. 595, 109 N.E.2d 636, the court held a statute could be relied upon—even though no breach thereof was specifically pleaded—as long as the complaint set forth facts from which the applicable law could be clearly ascertained.

■■ A review of the complaint indicates it sets forth a plain and concise statement of plaintiff's cause of action, thereby complying with section 33 of the Civil Practice Act (Ill. Rev. Stat. 1967, ch. 110, sec. 33); it also clearly informs the defendants of acts, which, if established, would fall within the ambit of the Uniform Deceptive Trade Practices Act. Defendants did not establish, nor can they now complain, that they were in any way misled. Further, the trial court had a right—if not a duty—to determine whether the evidence established any facts covered by the statute, and that is precisely what the court determined.

## II.

In support of their contention that the decree entered below is contrary to the law and the evidence, defendants assert a number of arguments; plaintiff failed to prove its trade dress is distinctive or that it had acquired a secondary meaning; defendants' bottles are not likely to be confused with plaintiff's, and thus cause plaintiff any damage; and the injunctive order is against public policy. Therefore, defendants strenuously urge that we reverse the court below.

Defendants claim that packaged consumer goods are not protectible against simulation unless the package dress is distinctive and has acquired a secondary meaning, and further that plaintiff's package dress consists of functional, descriptive, and common packaging elements which cannot become distinctive or achieve secondary meaning.

The trial court found plaintiff's package dress to be distinctive and found that the dress has acquired secondary meaning, denoting the source from which the goods emanate.

■■ The word "distinctive" means characteristic; having a distinct quality or position; a distinguishing mark or quality. (*In re Petition of Idaho State Federation of Labor (AFL)* (1954), 75 Idaho 367, 272 P.2d 707.) A "distinctive" mark, design, or trade dress is one which is a designation of source, rather than a characteristic of a product (*Wembley, Inc. v. Diplomat Tie Co.* (D.C. Md. 1963), 216 F.Supp. 565, 583),

and the test of distinctiveness is whether a mark or design or a trade dress (as in this case) is such that it distinguishes one's goods from the goods of others. Section 2 of the Trademark Act of 1946, 15 U.S.C.A. 1052.

■■ Acquisition of a secondary meaning means no more than an association in the public mind between the trade dress of a product and the source of that product thus marketed. (*Sinko v. Snow-Craggs Corporation* (7th cir. 1939), 105 F.2d 450.) At trial, plaintiff produced proof that defendants copied Clairol's trade dress, and plaintiff asserts the uncontradicted proof that defendants did so, in itself, established that the product possessed a secondary meaning. Plaintiff's assertion is correct. Proof of copying, together with visual comparisons showing similarity in use and appearance between Andrea Dumon's and Clairol's products, is sufficient to establish that the trade dress employed by the defendants is likely to deceive the public and cause public confusion as to source. *Audio Fidelity, Inc. v. High Fidelity Recordings, Inc.* (9th cir. 1960), 283 F.2d 551, 558.

The simple answer to defendants' contentions is the record itself. The evidence supports the trial court's finding that defendants intended to, and did, imitate plaintiff's trade dress, and by so doing, they gave truth to plaintiff's claim that its trade dress had acquired a secondary meaning.

Adopting a different line of argument, defendants go on to urge that the type of products involved here are purchased by persons exercising care in selection—which minimizes the possibility of confusion—and that Andrea Dumon's bottles are not likely to be confused with Clairol's or cause plaintiff any damage. Plaintiff avers, on the other hand, that confusion is likely to occur, and that evidence of actual confusion need not be shown in order that it prevail in a suit such as this.

■■ Consistent with Illinois law prior to the enactment of the Uniform Act (*Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc.* (1943), 317 Ill.App. 451, 46 N.E.2d 195), plaintiff assumed the burden of showing, in the court below, a likelihood of actual confusion or misunderstanding in the public's mind regarding the source of Andrea Dumon's and Clairol's products.

Section 312 of the Act (Ill. Annot. Stat. 1967, ch. 121½, sec. 312), entitled "Acts constituting deceptive trade practice," reads, insofar as is pertinent:

> "A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
>> (2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services.

> In order to prevail in an action under the Act, a complainant need not prove competition between the parties or actual confusion or misunderstanding."

It is clear from the legislative notes accompanying section 312(2) that the legislature intended, by the use of its phrase "likelihood of confusion or misunderstanding," to codify Illinois' common law tradition.

■■ Moreover, regarding defendants' contention that the products involved are such that purchasers would exercise care in selection, thus minimizing the possibility of confusion, the United States Court of Appeals for the Second Circuit recently held that even with expensive merchandise (cameras)—where some substantial degree of care might be expected in the transaction—purchasers may yet be confused between similar identifications even where there is a plain disclosure as to source. *Omega Importing Corp. v. Petri-Kine Camera Co., Inc.* (2nd cir. 1971), 451 F.2d 1190.

The underpinnings of the policy behind decisions to find unfair competition in trade dress simulation cases, such as the one at hand, was summed up in *Harold F. Ritchie, Inc. v. Chesebrough-Pond's, Inc.* (2nd cir. 1960), 281 F.2d 755, 758:

> "[I]t is permissible in the American competitive economy for the second comer to endeavor to capture as much of the first comer's market as he can. He must do this, however, by giving his product a name and dress descriptive and fanciful in its own right and selling it on its own merit, not by confusing the public into mistakenly purchasing his product for his competitor's. The second comer must create a reputation of its own and not trade on the goodwill of another product already established at considerable cost and risk."

With respect to the issue of likelihood of confusion, defendants' argument that plaintiff will not be damaged because of a lack of likelihood of confusion is wholly unsupported, as likelihood was found by the trial court and plaintiff certainly would stand to lose a great deal of business from the resultant confusion.

Shifting to another, different rationale, defendants argue that the law of unfair competition, as it pertains to trade dress simulation, is no longer viable in light of Supreme Court's decisions in *Sears, Roebuck & Co. v. Stiffel Co.* (1964), 376 U.S. 225, 11 L.Ed.2d 661, 84 S.Ct. 784, and *Compco Corp. v. Day-Brite Lighting, Inc.* (1964), 376 U.S. 234, 11 L.Ed.2d 669, 84 S.Ct. 779, while plaintiff contends those decisions have nothing whatever to do with the case at bar, as both dealt with the legality of so-called "knock-offs," *i.e.*, the copying and imitation of another's

product, devoid of any question concerning simulation of packaging or trademarks.

In *Compco*, the plaintiff had developed a commercial fluorescent lighting fixture with a cross-rib reflector intended to reduce chipping of the reflective coating and add strength, and the defendant, by incorporating plaintiff's design into its lighting fixture, was marketing obvious copies of the plaintiff's product. In *Sears*, the defendant sold a "pole lamp" copied from the plaintiff's.

The Supreme Court held in both cases that article I, section 8, clause 8 of the United States constitution vests the power in congress to grant patents; that the configuration of a device can be protected by a design patent; that the subject matter copied in the cases before it was within the bounds of what might be covered by a design patent, and, that, consequently, it would be unconstitutional interference for state common law to intrude into an area exclusively within the congressional province.

In *Sears* (376 U.S. at page 232, 84 S.Ct. at p. 789), the Supreme Court made clear that its holding pertained only to the copying of products and not to the copying of trademarks or packaging, which state law might validly protect from unfair simulation:

> "[D]oubtless a State may, in appropriate circumstances, require that goods, whether patented or unpatented, by labeled or that other precautionary steps be taken to prevent customers from being misled as to source, just as it may protect businesses in the use of their trademarks, labels, or *distinctive dress in the packaging of goods* so as to prevent others, by imitating such markings, from misleading purchasers as to the source of the goods. But because of the federal patent laws a State may not, when the article is unpatented and uncopyrighted, prohibit the copying of the article itself or award damages for such copying." (Emphasis added.)

Thus, the trial court's ruling that defendants' interpretation of these cases was mistaken is eminently correct; *Sears* and *Compco* involved the copying of articles or products, and not the simulation of trade dress.

Defendants rely heavily upon *Spangler Candy Co., v. Crystal Pure Candy Co.* (7th cir. 1965), 235 F.Supp. 18, *aff'd.* 353 F.2d 641, urging that the holding there precludes a decision against them here. We believe, however, that their reliance is misplaced.

In *Spangler*, plaintiff, a manufacturer of lollipops, had alleged trademark infringement and unfair competition by defendant-manufacture, which had marketed lollipops in packages admittedly imitating plaintiff's. The District Court dismissed plaintiff's complaint and defendant's counterclaim, and both parties appealed. The Court of Appeals affirmed,

holding that the evidence supported findings that plaintiff had failed to show, first, that defendant was "palming off," and, second, that plaintiff's lollipop package format had acquired a sufficient "secondary meaning."

First of all, we think it significant that the Uniform Deceptive Trade Practices Act was enacted subsequent to both *Spangler* decisions. Secondly, the key sections of the Act, some of which are particularly relevant to the case at bar, are no more than codifications of the modern, broad view of unfair competition exemplified by this court's analysis of the subject prior to the Act's adoption (*Lady Esther, Ltd. v. Lady Esther Corset Shoppe, Inc.* (1943), 317 Ill.App. 451, 46 N.E.2d 165); the prefatory notes to the Act (Ill. Annot. Stat. 1967, ch. 121½, sec. 311 *et seq.*) say as much:

> "In the area commonly referred to as 'passing off' or the deception of the consumer as to the source of a product, the Uniform Deceptive Trade Practices Act (subsections (1), (2), (3) and (4) of Section 312 of the Illinois Act) merely codifies and sets forth in logical fashion the liberal principles which have become associated with the tort of unfair competition in recent years, both in Illinois and other states."

■■ Armed with a knowledge of Illinois' common law tradition in the area of unfair competition, and with a history of the legislative intent underlying the Act's drafting and adoption, it is our view that the Act clearly seeks to provide a remedy for those subjected to the type of activity the defendants have engaged in here.

Defendants also offer several other cases to support their theories that they have not unfairly competed with plaintiff; that the public would not be confused or misled; that their package does not simulate plaintiff's; that public policy requires a reversal of the trial court's findings and decree; and so forth. Upon careful inspection of the authorities relied upon, however, all are distinguishable from the matter before us, either on the law or the facts.

The trial court, having listened to extensive testimony and having viewed the actual containers and other exhibits, issued detailed findings and conclusions of law. We have carefully reviewed the entire record and examined the actual containers and trade dress. We find there is substantial evidence to support the trial court's findings and the injunctive order issued.

### III.

Finally, defendants claim strongly that the trial court's award of $20,616.43 attorneys' fees and costs to the plaintiff was erroneous for

two reasons: (a) the court below failed to find that defendants were wilfully engaged in a deceptive trade practice, and (b) that bestowing the award was an abuse of discretion and, in addition, punitive.

The trial court acted under Section 313 of the Uniform Deceptive Trade Practices Act in assessing costs and attorneys' fees; the Section provides, in part:

"Costs or attorneys' fees or both may be assessed against a defendant only if the court finds that he has wilfully engaged in a deceptive trade practice."

Exercising its power under Section 313, the trial court, in its decree, held:

"That defendants having been found to have wilfully engaged in a deceptive trade practice in that they wilfully simulated plaintiff's trade dress, that plaintiff's costs and attorneys' fees be assessed against said defendants * * *."

The word "find" means to arrive at, as a conclusion, or to determine and declare (*State ex rel. Iowa National Mutual Insurance Co. v. Florida Industrial Com.* (Fla. 1963), 151 So.2d 636, 639), and that is the sense and meaning of "finds" in Section 313. Defendants would have us believe "finds" in the context of the Section calls for a recitation of findings of fact based upon the evidence of record, the recitation being the responsibility of the trial court; but defendants' semantical interpretation is not applicable. (*School Dist. No. 7 of Wallowa County v. Weissenfluh* (1963), 236 Ore. 165, 387 P.2d 567, 569.) We fail to discover any error in the actions of the trial court with respect to the award of attorneys' fees and costs. Such action was not against the manifest weight of the evidence.

The judgment of the circuit court of Cook County is accordingly affirmed.

Judgment affirmed.

STAMOS, P. J., and HAYES, J., concur.