LEROY BONNER et al., Plaintiffs and Counterdefendants-Appellees, v. WESTBOUND RECORDS, INC., et al., Defendants and Counterplaintiffs-Appellants.—(WESTBOUND RECORDS, INC., et al., Third-Party Plaintiffs and Third-Party Counterdefendants-Appellants, v. PHONOGRAM, INC., et al., Third-Party Defendants and Third-Party Counterplaintiffs-Appellees.)

First District (1st Division)    No. 76-699

Opinion filed June 8, 1977.

544

Donald E. Egan and Barry Levinsky, both of Katten, Muchin, Gitles, Zavis, Pearl & Galler, of Chicago, for appellants.

Elliott Kalcheim and Richard M. Shelton, both of Wallace, Shelton, Kleinman & Kalcheim, of Chicago, for appellees LeRoy Bonner *et al.*

Leonard L. Levin, of Levin & Berger, of Chicago, for appellees Phonogram, Inc., *et al.*

Mr. JUSTICE McGLOON delivered the opinion of the court:

The individual plaintiffs and Phonogram, Inc., moved for the issuance of a preliminary injunction against defendant Westbound Records, Inc., pursuant to the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 261 *et seq.*), the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 311 *et seq.*), and common law unfair competition, to enjoin the manufacture and distribution of a phonograph record entitled "Rattlesnake." After a hearing on the merits, the circuit court of Cook County issued the preliminary injunction. Defendant appeals, primarily arguing that the requirements for the issuance of a preliminary injunction were not satisfied.

We affirm.

The record discloses the following pertinent facts. On March 24, 1972, Westbound entered into a recording agreement with LeRoy Bonner, Marshall Jones, Marvin Pierce, Ralph Middlebrook, Gregory Webster, Norman Napier, Walter Morrison and Andrew Noland a/k/a Clarence Satchell. Under the terms of the agreement, Westbound employed each person individually and as a member of the musical group known as The Ohio Players, to render musical services at recording sessions arranged by Westbound. Westbound would subsequently manufacture and distribute phonograph records made from the tapes recorded at these sessions. On March 24, 1972, these musicians also signed a publishing agreement with Bridgeport Music, Inc., Westbound's publishing affiliate. Pursuant to these agreements, The Ohio Players wrote and performed songs for Westbound at recording sessions. In June, 1973, Westbound released a phonograph record entitled "Ecstacy," which contained some of the Ohio Players' recorded performances.

On January 8, 1974, five members of the group, Bonner, Jones, Pierce, Middlebrook, and Noland a/k/a Satchell, unilaterally repudiated the agreement. A week later, these five remaining group members, along with James Williams, signed a new agreement with another record company, Phonogram, Inc., and also signed a publishing agreement with Unichappell Music, Inc., Phonogram's affiliate. In March, 1974, the

plaintiffs filed the instant action seeking declaratory relief, an accounting, and injunctive relief upon their contention that their agreement with Westbound was void. Westbound filed a counterclaim praying for damages for breach of the agreement, and injunctive relief. Westbound also filed a third-party action against Phonogram, alleging inducement of breach of the agreement.

In July, 1975, after The Ohio Players' unilateral repudiation of their Westbound contract, and after the lawsuit was filed, Westbound released an Ohio Players phonograph record entitled "Climax," which Westbound had compiled from the tapes of recording sessions performed by The Ohio Players prior to their repudiation. A few months later Westbound released a phonograph record entitled "Ohio Players Greatest Hits," a composite of previously released Ohio Players recordings. In late November, 1975, Westbound released an Ohio Players phonograph record entitled "Rattlesnake."

Shortly after "Rattlesnake" was released, The Ohio Players asked Westbound to cease and desist from selling the record album, but Westbound refused. The Ohio Players also complained about the album to the Federal Trade Commission, alleging violations of trade practice rules. After Westbound persisted in selling the album, the plaintiffs amended their complaint against Westbound and moved for the issuance of a preliminary injunction enjoining the further sale of "Rattlesnake."

Plaintiffs' motion for the issuance of a preliminary injunction complains of ten out of "Rattlesnake's" eleven compositions. These compositions fall into four categories. First, the Players allege that four compositions ("Hustle Bird," "Rattlesnake," "Hollywood Hump," "She Locked It") were not peformed by The Ohio Players. Second, it is complained that two compositions ("Gone Forever," "What It is") were incomplete Ohio Players performances to which unknown musicians' performances had been added, thereby misrepresenting The Ohio Players' style. Third, the Players complain that two compositions ("What It Is," "Rooster Poot") were offered to the public as being the original compositions of "L. Crane" and "B. Bain," individuals not known to the Ohio Players, and further, that these two compositions were in fact composed by present and former members of The Ohio Players. Fourth, it is alleged that three compositions ("Spinning," "Varee Is Love," "Laid It") had been previously released to the public, and that their inclusion in "Rattlesnake" is a misrepresentation of new and current Ohio Players performances.

■■ Westbound's principal arguments on appeal reach the issue of whether the plaintiffs met the rigorous standards for the issuance of a preliminary injunction. In order for a preliminary injunction to properly issue, the petitioner must establish a likelihood of ultimate success on the merits of the case (*Kable Printing Co. v. Mount Morris Bookbinders*

*Union Local 65-B* (1976), 63 Ill. 2d 514, 349 N.E.2d 36), and that there is a need to preserve the status quo to prevent an irreparable injury for which there is no adequate remedy at law. (*Armour & Co. v. United American Food Processors, Inc.* (1976), 37 Ill. App. 3d 132, 345 N.E.2d 795.) In showing a likelihood of success on the merits, however,

> " * * * a party is not required to make out a case which will in all events warrant relief at the final hearing. All that is necessary is that the petitioning party raise a fair question as to the existence of the right claimed * * *." (*Grillo v. Sidney Wanzer & Sons, Inc.* (1975), 26 Ill. App. 3d 1007, 1013, 326 N.E.2d 180, 185.)

Westbound first argues that the plaintiffs have not raised a fair question as to the existence of their right to enjoin defendants from further sale of "Rattlesnake."

■■ Plaintiffs' claim for relief is grounded in the Consumer Fraud and Deceptive Business Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 261 *et seq.*), the Uniform Deceptive Trade Practices Act (Ill. Rev. Stat. 1975, ch. 121½, par. 311 *et seq.*), and unfair competition. The first issue is whether the plaintiffs may obtain injunctive relief under the Consumer Fraud and Deceptive Business Practices Act. This court has already had occasion to rule on this issue in *Brooks v. Midas-International Corp.* (1977), 47 Ill. App. 3d 266, 361 N.E.2d 815, where it was held that individuals were precluded from seeking injunctive relief under the Act since under section 7, only the Attorney General is authorized to bring an action for an injunction. (Ill. Rev. Stat. 1975, ch. 121½, par. 267.) We follow *Brooks* and hold that plaintiffs herein have not shown the existence under the Consumer Fraud and Deceptive Business Practices Act of a right to be protected by injunctive relief.

Plaintiffs' second theory is that they have a right to injunctive relief under the Uniform Deceptive Trade Practices Act. Section 3 of the Act expressly provides:

> "A person likely to be damaged by a deceptive trade practice of another may be granted an injunction against it in accordance with the principles of equity and upon terms that the court considers reasonable. Proof of monetary damage, loss of profits or intent to deceive is not required. * * *
>
> The relief provided in this Section is in addition to remedies otherwise available against the same conduct under the common law or other statutes of this State." (Ill. Rev. Stat. 1975, ch. 121½, par. 313.)

A preliminary injunction may, in the appropriate instance, be granted to enjoin a deceptive trade practice. (*Associates for Oral Surgery, LTD. v. Associates for Oral & Maxillofacial Surgery, LTD.* (1976), 39 Ill. App. 3d 73, 350 N.E.2d 109; *Mars, Inc. v. Curtiss Candy Co.* (1972), 8 Ill. App. 3d

338, 290 N.E.2d 701.) The petitioner must first show that he is likely to be damaged by another's deceptive trade practice. Deceptive trade practices are defined by section 2 of the Uniform Deceptive Trade Practices Act. (Ill. Rev. Stat. 1975, ch. 121½, par. 312.) Plaintiffs herein contend that the defendant's conduct constituted deceptive trade practices under the following definitions of section 2:

"A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:

(1) passes off goods or services as those of another;

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship approval or certification of goods or services;

(3) causes likelihood of confusion or misunderstanding as to affiliation, connection or association with or certification by another; * * *

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have;

(6) represents that goods are original or new if they are deteriorated, altered, reconditioned, reclaimed, used or secondhand; * * *

(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding."

Section 2 also states:

"In order to prevail in an action under this Act, a complainant need not prove competition between the parties or actual confusion or misunderstanding.

This Section does not affect unfair trade practices otherwise actionable at common law or under other statutes of this State."

The plaintiffs' position, simply stated, is as follows: Defendants took unedited and unfinished Ohio Players performances on tape, wrote new music and words to go along with the incomplete songs, hired other musicians to play the new music and words, overdubbed the new music and words onto the Ohio Players performances, edited the new songs, and released them as being performed by The Ohio Players in "Rattlesnake." It is claimed that by so doing, Westbound passed off the creations and performances of others as those of The Ohio Players, caused a likelihood of confusion or misunderstanding as to who performed and wrote the songs on "Rattlesnake," and misrepresented that the album was performed by The Ohio Players, all the above allegedly being deceptive trade practices.

■■ The Uniform Deceptive Trade Practices Act was designed to provide a remedy to be utilized where a likelihood of confusion or

misunderstanding exists or may exist in the public's mind as to goods or services. (*Clairol, Inc. v. Andrea Dumon, Inc.* (1973), 14 Ill. App. 3d 641, 303 N.E.2d 177.) As we view the evidence presented in this case, plaintiffs have proved the likelihood that the public would believe that "Rattlesnake" by The Ohio Players contains only performances by The Ohio Players and unnamed musicians who may have accompanied them at their recording sessions. In fact, "Rattlesnake" contains performances by The Ohio Players as subsequently interpreted, edited, and substantially altered by persons other than The Ohio Players, without their consent. Plaintiffs have alleged and shown a likelihood of proving Westbound's deceptive trade practices.

■■ Westbound's primary defense is that its agreement with the plaintiffs allowed it to overdub performances by musicians other than plaintiffs. The applicable provisions state:

> "2(A) Artist will render services at recording sessions scheduled at times and places designated by Company. Company shall select the musical compositions or other material to be performed by Artist and shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.
>
> * * *
>
> (E) Company shall have the right to determine which of Artist's performances shall be coupled with other performances of the Artist, upon phonograph records of such sizes and speeds as Company also shall determine.
>
> * * *
>
> (F) Company shall have the right to couple performances rendered by the Artist with performances rendered by others upon phonograph records of such sizes and speeds as Company alone shall determine."

It is argued that the term "couple," in the context of the agreement, includes overdubbing of the performances of others. We disagree, based upon the clear meaning of the contract. Webster's Third New International Dictionary contains a precise and reasonable definition for "couple" in the context at bar: "to record on opposite sides of a phonograph record or in the same series of records * * *." The plain meaning of the contract controls, and is contrary to that proposed by defendant Westbound. "To couple" does not include the overdubbing of performances other than those rendered at plaintiffs' recording sessions.

■■ Westbound argues in the alternative that the contract read as a whole gives Westbound the right to control the final product, so that Westbound has the right, in effect, to do anything it wishes with the recordings of plaintiffs' performances. Plaintiffs contend that the addition

of a completely new melody to unfinished, incomplete Ohio Players performances is a complete injustice, is deceitful and fraudulent, and is not sanctioned by the agreement between the parties. The resolution of this issue is contained within the experience of the common law. As stated in 18 Am. Jur. 2d *Copyright and Literary Property* §5 (contracts between author and publisher), at 308 (1965):

> "Contracts in relation to literary property must be interpreted and the rights of the parties determined with regard to the special nature of the thing which is the subject of the contract. * * * While the parties may each make suitable corrections for the sake of technical accuracy, the inference is that a publisher has no right to make material alterations or omissions unless that right is expressly given or plainly implied from the language of the contract under which the author parts with his property rights in the work; and the publisher cannot publish the manuscript as being that of one other than the true author."

See also 18 C.J.S. *Copyright and Literary Property* §10g (1939).) In *Chesler v. Avon Book Division, Hearst Publications, Inc.* (1973), 76 Misc. 2d 1048, 352 N.Y.S.2d 552, 556, it was stated: "An author or artist is entitled to judicial protection where there is a sufficient demonstration of 'mutilation' or other serious alteration of the creator's work." As we understand the law, it is implied at law in contracts for the sale of artistic or literary creations, that the purchaser may not materially alter the literary property or creation, in the absence of express language so permitting. In the case at bar, the agreement between plaintiffs and Westbound provided:

> "All master recordings made hereunder, as well as all performances embodied thereon and all phonograph records derived therefrom, together with any property rights therein, whether presently existing or hereafter created, will be the exclusive property of [Westbound] free of any claim whatsoever by Artist or by anyone deriving rights from Artist."

This provision did not grant to Westbound the right to do what it did to plaintiffs' taped performances, namely, to materially alter the plaintiffs' performances by writing and recording new music and words and then adding the new material to the plaintiffs' performances. Westbound acknowledges, and the evidence shows, that Westbound added the new material. The plaintiffs (excluding Williams), as members of The Ohio Players at the time the contract was entered into, did not expressly relinquish the right to protect their creations from substantial alterations.

We wish to note that in determining the parties' rights under the contract, we do so only to determine whether the defendant had a contractual right which would preclude the issuance of a preliminary

injunction, as was the case in *Capsonic Group, Inc. v. Plas-Met Corp.* (1977), 46 Ill. App. 3d 436, 361 N.E.2d 41. We do not intend to render a decision as to whether the instant action is justifiable under the Doctrine of Moral Right, or *droit moral.* (See Roeder, *The Doctrine of Moral Right: A Study in the Law of Artists, Authors and Creators,* 53 Harv. L. Rev. 554 (1940); *Chesler v. Avon.*) Nor do we render an opinion as to whether a party may contract away rights to bring an action pursuant to the Uniform Deceptive Trade Practices Act. In summary to this point, we find only that plaintiffs have established the likelihood of success on the merits of their claim that defendant committed a deceptive trade practice.

Defendant next argues that plaintiffs have not demonstrated irreparable harm for which there is no adequate remedy at law. Having already found a likelihood of success on the merits in proof of a deceptive trade practice, it necessarily follows that irreparable harm has been demonstrated.

> "Unfair competition likely to extend into the future is deemed to cause irreparable injury and, consequently, equity has jurisdiction of an action to prevent unfair competition and to grant relief by way of injunction."

*(Kinsey Distilling Sales Co. v. Foremost Liquor Stores, Inc.* (1958), 15 Ill. 2d 182, 194, 154 N.E.2d 290, 296.) Since the Uniform Deceptive Trade Practices Act codifies Illinois common law as to unfair competition, and unfair competition within the common law and the statute under discussion in *Kinsey* are generally the same, we believe defendant's arguments in this regard must fail.

■■ Defendant next interjects the equitable defenses of unclean hands and laches. As to unclean hands, Westbound argues that plaintiffs have unclean hands because they unilaterally repudiated the agreement between the parties. The clean hands doctrine, however, is not intended to prevent equity from doing justice, and the application of the doctrine is a matter for the sound discretion of the court. (*Cahokia Sportservice, Inc. v. Illinois Liquor Control Com.* (1975), 32 Ill. App. 3d 801, 336 N.E.2d 276.) The record discloses that there is no clear showing of plaintiffs' unclean hands by reason of their repudiation of January, 1974. Two months later, on March 7, 1974, plaintiffs filed their original complaint charging that the agreement was unenforceable. While the complaint was pending, "Rattlesnake" was released and the motion for issuance of a preliminary injunction was filed. Without a determination on the merits of plaintiffs' complaint, the applicability of the doctrine of unclean hands could not reasonably be invoked.

■■ As to the equitable defense of laches, Westbound claimed in its answer that the plaintiffs' delay from November 1975, when

"Rattlesnake" was released, to March 4, 1976, when the motion for preliminary injunction was filed, would cause Westbound great damage. This argument fails to consider that plaintiffs complained of "Rattlesnake" within a week of its release, having notified Westbound to cease and desist from further sale of "Rattlesnake." One of the considerations for a finding of laches is "(3) lack of knowledge or notice on the part of the defendant that the complainant would assert the right on which he bases his suit * * *." (*Pyle v. Ferrell* (1958), 12 Ill. 2d 547, 553, 147 N.E.2d 341, 344.) Westbound admits being notified of the plaintiffs' desires to have "Rattlesnake" withdrawn from sale, and furthermore, of plaintiffs' complaint to the Federal Trade Commission, dated December 16, 1975. Every indication of record discloses that defendant had ample knowledge of plaintiffs' intent to assert their legal rights against the further sale of "Rattlesnake."

■■ Westbound argues that necessary parties are missing from this action, and that the trial court erred by issuing the preliminary injunction without the presence of the necessary parties. This argument is not germane at the present stage of the litigation, this matter arising upon an interlocutory appeal.

Finally, Westbound complains that the trial court set an insufficient injunction bond of $15,000 where the evidence showed that Westbound had expended in excess of $250,000 in the production and marketing of "Rattlesnake." Section 9 of the Injunction Act provides:

> "In all other cases, the court or judge, in his or its discretion, may before issuing a restraining order or a preliminary injunction, require the applicant to give bond in such sum, upon such condition and with such security as may be deemed proper by the court or judge, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained." (Ill. Rev. Stat. 1973, ch. 69, par. 9.)

Westbound contends that the plaintiffs' bond as set by the trial court would not be sufficient to pay Westbound's costs and damages incurred by reason of the wrongful issuance of the preliminary injunction. Since we are holding that the preliminary injunction was properly issued, the error, if any, in the setting of the injunction bond, would not render the injunction void. See 43 C.J.S. *Injunctions* §166(e)(2) (1945).

In conclusion, we find that the trial court properly exercised its discretion in entering a preliminary injunction in this cause. Accordingly, the preliminary injunction order is affirmed.

Order affirmed.

O'CONNOR and BUA, JJ., concur.