**OLIVER GINTEL, INC.**

v.

**KOSLOW'S, INC.**

**Civ. A. No. CA 4-2105.**

United States District Court,
N. D. Texas,
Fort Worth Division.

Feb. 12, 1973.

Henry Klepak and Lamar Carnes, Dallas, Tex., for plaintiff.

Milton J. Mehl, Mehl, Williams, Cummings & Truman, Robert A. Felsman, Wofford, Felsman & Fails, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION

MAHON, District Judge.

The subject of this litigation is the trade name "Black Diamond" and certain trade-marks and symbols relating thereto.

At the hearing conducted on Gintel's Application for Injunctive Relief, it was shown that on December 30, 1952, Katzman and Wear, Inc., an Illinois corporation, received Registration No. 586,546 from the United States Patent Office. The mark thus registered, a parallelogram or diamond above the words "Black Diamond" in script, was first used in commerce by Katzman and Wear, Inc., on January 29, 1951. Katzman, Field and Wear, Inc., successor to Katzman and Wear, Inc., was adjudged bankrupt on December 4, 1953. Thereafter, on December 17, 1953, Oliver Gintel, at public auction, bought from the Receiver in Bankruptcy all "right, title, and interest in and to that certain trade-mark registered in the United States Patent Office on December 30, 1952, Registration No. 568,546, and in and to the business and good will of the business of Katzman, Field, and Wear, Inc., bankrupt, in connection with the manufacture, sale, and distribution of the product as heretofore conducted by it under the said trade-mark." The testimony reflects that Katzman and Wear, Inc., and Katzman, Field, and Wear, Inc., were furriers in Chicago and that they advertised the trade name "Black Diamond" and the above trade-mark in national magazines

with reference to the sale of fur garments.

For some period of time Koslow's, Inc., operated under an agreement with Oliver Gintel, Inc., and his "House of Black Diamond" whereby Koslow was given the exclusive rights to sell Gintel's "Black Diamond" furs in Fort Worth, Texas. In September, 1971, a dispute arose between Koslow and Gintel based upon the alleged use of the name "Black Diamond" by Koslow in connection with the sale of fur garments other than those provided by Gintel and which were allegedly of a quality inferior to those marketed by the "House of Black Diamond." After a confrontation between Gintel and Koslow in New York, Gintel terminated the agreement under which Koslow had been marketing "Black Diamond" furs.

A short time after the arrangement with Gintel had been terminated, Koslow entered into an agreement with Maynard and Angeline Johnson of Two Harbors, Minnesota, whereby Koslow's, Inc., became the "exclusive licensee" for the use of the term "Black Diamond Fur Farm" in the sale of fur pieces and products.

Maynard Johnson had been engaged in the fur business since he was fourteen years of age and testified that he has operated the "Black Diamond Fur Farm" "since before 1940." Since the time the agreement was entered into between Johnson and Koslow in September of 1971, Koslow has been continuously, and is at the present, using the name "Black Diamond Fur Farms" in the sale and advertising for sale of fur garments.

Koslow contends at the outset that the use of the name "Black Diamond Fur Farms" by Maynard and Angeline Johnson continuously since sometime prior to 1940 precludes the use of the name "Black Diamond" by Oliver Gintel, Inc., in Fort Worth. It is further urged that such prior use would void the trademark registered by Katzman and Wear, Inc., in 1952. To this effect, Koslow's

introduced the testimony of Maynard Johnson whereupon it was shown that Johnson has raised various fur-bearing animals, including some mink, at his Black Diamond Fur Farm in Minnesota; that he had on occasion exhibited at shows certain animals raised on his farm; that pelts of some animals raised on his farm had been sold at auction in various eastern states, as was the custom in the fur business, to representatives of those concerns who purchased pelts and who subsequently manufactured garments therefrom for commercial sale; and that, from time to time, various articles and advertisements had appeared in trade magazines and trade journals relating to the breeding of fur-bearing animals under the name of Black Diamond Fur Farm.

Testimony adduced by the plaintiff, Gintel, reflected that since acquiring technical trade-mark rights from Katzman, Field, and Wear, Inc., in 1953, Oliver Gintel and certain business partners, now deceased, as well as what thereafter became Oliver Gintel, Inc., and the "House of Black Diamond", have manufactured high-quality fur garments under the name "Black Diamond"; that only the pelts of female mink are used in such garments; that, in making such garments, the pelts are cut and thereafter sewn together in such a way as to interlace with each other—a technique apparently not altogether common in the making of such apparel; that only natural ranch mink pelts are used, i. e., no died pelts are utilized by Gintel's "House of Black Diamond" in producing or manufacturing garments bearing the trade-mark "Black Diamond"; and that all such garments sold through Gintel's, Inc., bear an individual registration number affixed thereto prior to their leaving Gintel's, Inc. It was further shown that Oliver Gintel has advertised fur garments under the name "Black Diamond" in fashion magazines of national circulation, and that Gintel first utilized that trade-mark in the mid-1950's; that garments from the "House of Black Diamond" are sold throughout the United States and in certain foreign countries; that furriers as well as their clientele identify the name "Black Diamond" with the highest quality fur garments available for purchase; and that further, such garments and the name "Black Diamond" are associated with Oliver Gintel's House of Black Diamond in New York.

Under the pleadings filed herein, issues of trade-mark infringement[1] and "unfair competition" are raised. Included in the evidence before the Court is Registration No. 586,546 whereby the words "Black Diamond" and a diamond-shaped mark are registered with and by the United States Patent Office, and which is shown by the testimony to belong to Plaintiff Gintel. Section 7(b) of the Lanham Act provides:

"A certificate of registration of a mark upon the principal register provided by this chapter shall be prima facie evidence of the validity of the registration, registrant's ownership of the mark, and of registrant's exclusive right to use the mark in commerce in connection with the goods or services specified in the certificate, subject to any conditions and limitations stated therein." 15 U.S.C. § 1057(b) (1970).

Thus it is clear that under federal trade-mark law the registrant is presumed to have exclusive rights in the use and development of a trade-mark and trade name *subsequent* to the time of registration. The registration of a mark, however, does not create or enlarge a registrant's rights, Turner v. HMH Pub. Co., 380 F.2d 224 (5th Cir. 1967), cert. denied 389 U.S. 1006, 88 S. Ct. 566, 19 L.Ed.2d 601 (1967); consequently, any rights belonging to Maynard Johnson which had been obtained prior to the registration would not be extinguished thereby. Burger King v. Hoots, 403 F.2d 904 (7th Cir. 1968). Although the Court expressly directed

---

1. Lanham Act, 15 U.S.C. § 1051 et seq. (1970).

questions toward this issue, there is nothing in the testimony to reflect the use of the name Black Diamond in trade in the Fort Worth area by Maynard Johnson prior to September, 1971. While there was some testimony that his farm was known as Black Diamond Fur Farm in trade magazines in the 1940's, there was nothing showing circulation of such publications in the Fort Worth area, nor was there anything to show association of the name Black Diamond Fur Farms with any finished products such as wearing apparel. To the contrary, the testimony reflected that that name was utilized by Johnson only in relation to the site where certain animals were bred and raised, and *possibly* in the sale of pelts in certain eastern markets.

█ Further, the fact that Johnson and/or his affiliates may have had prior rights in a trade name would not necessarily preclude their being guilty of unfair competition. Socony Vacuum Oil Co. v. Oil City Refiners, 136 F.2d 470 (6th Cir. 1943), cert. denied, 320 U.S. 798, 64 S.Ct. 369, 88 L.Ed. 482 (1943).

██ The doctrine of unfair competition is founded upon the common law; it is a tort and is governed by law of the state wherein the cause of action arises. General Adjustment Bureau v. Fuess, 192 F.Supp. 542, 547 (S.D.Tex.1961).

"Unfair competition is a form of unlawful business injury which consists essentially, in the passing off or attempting to pass off on the public, the goods or business of one person as and for the business of another, or in the conduct of a trade or business in such a manner that there is either an expressed or implied representation to that effect. . . .

[N]o one has a right to avail himself of another's favorable reputation in order to sell his own goods. The law has a three-fold object in unfair competition cases: (1) To protect the honest trader in business which fairly belongs to him. (2) To punish the dishonest trader who is taking his

competitor's business away by unfair means. (3) To protect the public from deception.

The doctrine of unfair competition is based upon the principle of common business integrity. . . .

. . . A competitor may not use a name, whether fictitious or real, or a description, whether or not true which is intended or calculated to represent to the world that his business is that of another, and by such fraudulent misstatements deprive the latter of business which would otherwise come to him." 87 C.J.S. Trade-Marks, Trade-Names, and Unfair Competition, §§ 13–14, 89; McCarley v. Welch, 170 S.W.2d 330 (Tex.Civ.App. —Dallas 1943, no writ); Plaza Co. v. White, 160 S.W.2d 312 (Tex.Civ.App. —San Antonio 1942, writ ref'd); Avnet v. Texas Centennial Central Exposition, 96 S.W.2d 685 (Tex.Civ.App.— Dallas 1936, writ dism'd).

█ While it is not necessary to prove intentional wrongdoing to sustain an allegation of unfair competition, McCarley v. Welch, 170 S.W.2d 330, 332 (Tex.Civ.App.—Dallas 1943, no writ), evidence thereof is before the Court and is subject to consideration where, as here, injunctive relief is being sought. Hellyer v. Wig Imports, Inc., 458 S.W.2d 492, 495 (Tex.Civ.App.—Eastland 1970, no writ); Austin v. Lockett, 211 S.W.2d 986 (Tex.Civ.App.—Dallas 1948, no writ); Burge v. Dallas Retail Merchants Ass'n., 257 S.W.2d 733 (Tex.Civ.App. —Dallas 1953, no writ).

The evidence shows that Koslow's, Inc., first utilized the name "Black Diamond" in connection with the marketing of fur garments only after having entered into an agreement with Oliver Gintel's "House of Black Diamond" allowing them to do so. Further, it was only after the confrontation with Gintel in New York whereat Gintel terminated Koslow's rights under the agreement (because of Koslow's alleged breach thereof) that Koslow approached Maynard Johnson and entered into an ar-

rangement with Johnson for the use of the name "Black Diamond Fur Farm."

From Johnson's testimony it is clear that he is engaged only in the breeding of fur-bearing animals and is in no way directly connected with the making of fur garments; at no time did Johnson ship or supply any pelts to Koslow's, Inc. Only the right to use the name "Black Diamond Fur Farm" was involved in the agreement entered into between Koslow and Johnson. Further, there is no showing that Koslow's, Inc., has ever received even one garment that was made from pelts originating at Johnson's Black Diamond Fur Farm.

Under the circumstances, the conclusion is inescapable that Koslow's arrangement with Johnson was made for the sole purpose of enabling Koslow's to continue using the name Black Diamond in the sale and advertising of furs in an effort to pass off garments thus sold as actually being those originating with the House of Black Diamond. The element of deception is clear and the continued use of the name Black Diamond by Koslow's, Inc., in advertising and in sales is not to be countenanced by this Court.

The term "Black Diamond Fur Farm" as used herein by Koslow's, Inc., particularly with reference to the advertising and sale of fur garments, is deceptively similar to the registered name and mark "Black Diamond." However, the Court is not called upon to determine the validity of the trade-mark owned by Gintel or the rights protected thereby if such mark is valid;[2] the evidence before this Court is ample to show unfair competition, to show a likelihood of confusion as to the source of furs sold by Koslow, to show a wrongful intention on Koslow's part to appropriate the name, the trade and the good will of plaintiff, and to show injury to the plaintiff.

Accordingly, plaintiff's motion for a preliminary injunction is granted. Defendant Koslow's, Inc., is enjoined and restrained from using in the advertising, marketing, or sale of fur garments and apparel, any term or phrase which includes the words "Black Diamond".

---

2. It is noted that among the assertions made by defendant which are directed at showing the invalidity of plaintiff's registered trade-mark is the contention that the marketing structure and rights afforded under Gintel's marketing program are in violation of antitrust laws, and, more particularly, in violation of the laws and principles stated in United States v. Topco Associates, Inc., 405 U.S. 596, 92 S.Ct. 1126, 31 L.Ed.2d 515 (1972). While the invalidity of the plaintiff's trade-mark would constitute a defense to a suit of infringement, and while an antitrust violation might in certain circumstances constitute a separate defense, Brunswicke-Balke-Collender Co. v. American Bowling & Billiard Co., 3 F.R.D. 478 (S.D.N.Y. 1943), the Court is of the opinion that the alleged antitrust violation herein asserted would provide no defense under the facts here present. See, e. g., Eastman Kodak Co. v. Lee-Wilson, Inc., 138 F.Supp. 591 (D.Mass.1955).