NATIONAL BANK OF COMMERCE, Independent Executor and Trustee of the Estate of Heloise Bowles, and Hearst Corporation, Plaintiff,

v.

SHAKLEE CORPORATION, Defendant.

Civ. A. No. SA–74–CA–12.

United States District Court,
W. D. Texas,
San Antonio Division.

July 16, 1980.

T. Kellis Dibrell, Dibrell, Dotson, Dibrell & Dibrell, Hobart Huson, Jr., Bradford F. Miller, Majestic Bldg., San Antonio, Tex., for National Bank, etc.

James D. Baskin, Matthews, Nowlin, MacFarlane & Barrett, San Antonio, Tex., for Hearst Corp.

Harry G. Weissenberger, Phillips, Moore, Weissenberger, Lempio & Majestic, San Francisco, Cal., J. Burleson Smith, Cox & Smith, San Antonio, Tex., for defendant.

BOOTLE,* Senior District Judge:

This court, having considered oral testimony, numerous exhibits and deposition testimony introduced at a three–day nonjury trial, extensive briefs on law and fact, and the parties' proposed findings of fact and conclusions of law, is now ready to decide the numerous factual and legal issues presented in this case.

## I. The Actors

The numerous actors in this case and their sometimes complicated relationships prompts a discussion of each in an effort to give background to the rest of this opinion.

Ms. Heloise Bowles was the original plaintiff in this action. She sued the Shaklee Corporation for damages, alleging invasion of privacy, misappropriation of her name and likeness, copyright infringement, trademark violation, and unfair competition, arising out of Shaklee's causing the publication of a special edition of Heloise's book "All Around the House" and of certain advertisements or articles in Shaklee's magazine, the *Shaklee Survey*. During the

* Sitting by designation.

pendency of this suit, Heloise died and the executor of her estate, the National Bank of Commerce, was substituted as party plaintiff.

Heloise authored a newspaper column entitled "Hints From Heloise" which appeared daily in some 580 to 600 newspapers in the United States and abroad. In addition, she authored several books dealing with the same topics dealt with in her column. The books and the column are collections of household hints intended to make household chores easier. The column began in 1959 when Heloise started a readers' exchange in a local Honolulu, Hawaii newspaper. Shortly thereafter, she was successful in selling the column to a few other newspapers located in Texas. The success of Heloise's column attracted King Features Syndicate, a wholly–owned subsidiary of the Hearst Corporation, which syndicated the column and promoted it to its present nationwide distribution.

The column depends heavily on receiving and publishing helpful ideas contributed by readers. Some 4,000 to 5,000 letters per month provide these hints. On at least one occasion, 100,000 letters were received in one month. The column's success is at least partly attributable to certain policies followed by Heloise. One of these policies was never to refer to any product by brand name; instead a generic name was used. Thus, Heloise never, in her long career, endorsed any specific product. A second policy followed by Heloise was to test each hint before including it in her column so that she could give assurance that each would work.

Heloise's success as author of the column has brought her nationwide recognition. She has been featured in articles published in the *New York Times, Life* magazine, and *Fortune*. After her death, the *New Yorker* published a letter from an admirer recounting her career.

The Hearst Corporation was added as a party plaintiff to this action as a result of early procedural skirmishes not particularly relevant at this point. Hearst adopted the contentions of Heloise but did not ask for damages on its own behalf. Hearst's wholly–owned subsidiary, King Features Syndicate, has held rights to Heloise's column and books since the early 1960's. Pursuant to those contractual rights, King Features granted all publishing rights in the books authored by Heloise to Prentice–Hall. Prentice–Hall in turn granted paperback publishing rights to Pocket Books, a division of Simon & Schuster, Inc. The contracts between Pocket Books and Prentice–Hall require that Pocket Books obtain the permission of King Features for any premium or commercial use of Heloise's books. The pertinent contract between Heloise and King Features requires that King Features obtain her permission for any commercial use of her books.

The Benjamin Company is a publisher that acts as a special projects sales office for Pocket Books with responsibility for promoting bulk and special project sales of books owned by Pocket Books. Over a number of years, Benjamin Company has caused the bulk and premium sale of several of Heloise's books. Armstrong and Associates is an advertising firm in California which is associated with Benjamin Company as a commissioned sales agent for that area. Tom Golden is employed by Armstrong and Associates and in that capacity brought Benjamin Company and the defendant Shaklee Corporation together on the purchase and sale of a special edition of Heloise's book *All Around the House.*

The Shaklee Corporation is a direct sales organization which manufactures and sells household cleaners, food supplements, and cosmetics. These three categories together include approximately 100 different products. Shaklee operates through a nationwide organization of independent distributors, numbering approximately 240,000, who buy Shaklee products for resale and for their own use. These distributors are often husband and wife teams.

## II. The Facts

The events which culminated in this lawsuit began sometime in the early fall of 1972 when Tom Golden of Armstrong and

Associates contacted Shaklee Corporation in an attempt to interest Shaklee in the purchase of a number of one of Heloise's books as a promotional scheme for Shaklee. The proposal offered to Shaklee included adapting the book as a special Shaklee edition by including Shaklee artwork and messages on the front and rear covers and in the text. In January 1973, Shaklee accepted the proposal and agreed to order 100,000 copies of the special edition. By letter dated January 19, 1973 Ted Benjamin, Executive Vice-President of the Benjamin Company, sought permission from King Features, as required by Pocket Book's contract with Prentice–Hall, to proceed with the premium sale of Heloise's *Housekeeping Hints* book to Shaklee. The letter asks, "May we have your okay for the program, based on the payment of your standard $1000 fee in connection with the use of Heloise's book?" John Wright, Director of Merchandising and Special Projects at King Features, approved the proposal as outlined in the letter. The letter did not refer to the modifications and additions planned to transform the book into a special Shaklee edition. Mr. Benjamin was at that time under the impression that Shaklee wished to use Heloise's book entitled *Housekeeping Hints* but was shortly made aware that the book desired by Shaklee was Heloise's *All Around the House*. King Features was not notified of the change in books until a July 12, 1973 letter from Ted Benjamin requesting that the $1000 fee be invoiced. The change apparently went unnoticed even then by King Features as the invoice issued in response to that letter attributes the $1000 fee to "use of Heloise's Housekeeping Hints Book."

Shaklee's promotional scheme involved the purchase of the books at 38 cents per copy and resale to their distributors at 50 cents per copy. The distributors were then free to sell or give away the books to customers as they desired. As a part of this promotion scheme, Shaklee included an advertisement in the February 1973 issue of the *Shaklee Survey*, which is a magazine published by Shaklee for use by its distributors, to induce distributors to purchase the

books. A copy of this full page advertisement is attached as Appendix A. At the top is a printed hexagonal shaped logo with the words "All Around the House" and two daisies encircling a house. Immediately below the logo are the words, "Welcome a New Shaklee Woman, Heloise." "Heloise" is printed in very large script with a daisy instead of a dot over the "i". Both the logo and the unique script printing of "Heloise" were apparently taken from the cover of an older edition of Heloise's book *All Around the House*. The design for "Heloise" is the same as has been used for years on the Sunday "Hints from Heloise" column. The text of the advertisement continues, " 'Heloise'–the nationally–syndicated columnist whose success with household hints has made her a household name–will soon be helping you to open doors and make more sales with Shaklee." The last sentence of the advertisement states, " 'Heloise' is just one of the many sales helpers being developed to make your selling easier."

In the April 1973 issue of the *Shaklee Survey* appears a follow–up article entitled "Meet the Lady Behind All Those Hints," accompanied by a photograph of Heloise. The article gives biographical data about Heloise and the details of the Heloise book offer. Quotes of some of the hints from the book are included as a sample. Heloise is said to be "an excellent addition to your sales group" and readers are urged to order now "[t]o put Heloise on [their] sales team."

Ms. Camille Curran, the Editor of the *Shaklee Survey*, was responsible for the two article–advertisements published in the *Survey*. She stated as her reason for believing that the Heloise book promotion was not a success, "I would say based on the field reaction, they as a rule have never felt comfortable with anybody outside the organization promoting their product or endorsing them."

The Shaklee edition of *All Around the House* is identified on the front cover by the words "Special edition from Shaklee" appearing in white lettering on a small black oval background. On the back cover

appears a Shaklee advertisement outlining the categories of products sold by that company. At the top of that cover advertisement are the words "Heloise, Heroine of the Household." Then follows the sentence, "Heloise and Shaklee all around the house just naturally make your day easier!" On the inside of the book, printed in the text, appear boxed Shaklee advertisements of various products, each positioned at the end of a chapter. There are sixteen of these advertisements scattered throughout the book. All of these advertisements and the additions to the covers of the book were authored by Shaklee.

Heloise never gave permission to Shaklee, Benjamin Company or anyone else for the use of her name, likeness, or book in connection with Shaklee's advertising campaign. In fact, she was never shown any of the materials published in the *Shaklee Survey* or the changes made in the book until after they were published and sold to the public. Neither did King Features grant permission to anyone to use Heloise's name and likeness in the manner in which they were used.

### III. Choice of Law

Shaklee argues that Heloise's claims for invasion of privacy, misappropriation of her name and likeness, and damages for pain and suffering must abate as they do not survive her death. This contention is premised on Shaklee's further argument that California law should control those issues under Texas' choice of law rules.

Under California law, it is clear that Heloise's claim for pain and suffering would abate. Cal.Prob.Code § 573 (West). However, it is not so clear that her cause of action for invasion of privacy and for misappropriation would be subject to the same fate.[1] However, as the California rule on pain and suffering is clear, the court, for the purposes of this discussion, may assume that her cause of action for invasion of privacy and for misappropriation would also abate.

No Texas court has answered the precise question whether an invasion of privacy or a misappropriation cause of action is survivable under Texas law. The Texas survival statute states that "[a]ll causes of action upon which suit has been or may hereafter be brought for personal injuries, or for injuries resulting in death, whether such injuries be to the health or to the reputation, or to the person of the injured party, shall not abate ... by reason of the death of such injured person ...." Tex.Civ.Stat.Ann. Art. 5525. Tex.R.Civ.P. 150 states that "[w]here the cause of action is one which survives" no suit shall abate because of the death of any party thereto before the verdict or decision of the court is rendered. It is clear that claims for pain and suffering as an element of damages are not barred by Art. 5525 if they are ordinarily recoverable as damages under a cause of action which survives. *See Martinez v. Angenstein*, 517 S.W.2d 811 (Tex.Civ.App. 1975). In addition, the Texas courts have not read Art. 5525 narrowly. For instance, the Texas courts have long allowed the survival of

---

1. In 1961, California amended its survival statute to read as follows: "Except as provided in this section no cause of action shall be lost by reason of the death of any person ...." Cal. Prob.Code § 573 (West). The remainder of the section does not expressly exclude any cause of action when the plaintiff dies after filing suit and before judgment but does exclude a recovery of damages for pain, suffering or disfigurement. The amendment replaced a statute that allowed survival of only certain classes of action and thus was intended to broaden the survival rules. Shaklee relies principally upon two California Court of Appeals decisions, *Guglielmi v. Spelling-Goldberg Productions*, 73 Cal.App.3d 436, 140 Cal.Rptr. 775 (1977) and *Lugosi v. Universal Pictures*, 70 Cal.App.3d 552, 139 Cal.Rptr. 35 (1977). Each of these cases is distinguishable, however, because each involved claims of misappropriation of an ancestor's name and likeness occurring long after the ancestor's death. The question thus presented was not whether a cause of action for a misappropriation occurring during the lifetime of a decedent should survive but whether the ancestor's right to control the use of his name and likeness was a right that could be inherited and enforced by the ancestor's heir. The statement that an action for invasion of privacy does not survive was made in *Hendrickson v. California Newspapers, Inc.*, 48 Cal. App.3d 59, 121 Cal.Rptr. 429 (1975) but was dictum apparently based on cases decided prior to the 1961 change.

actions for injury to property under the authority of Art. 5525 despite its language referring only to "actions for personal injuries." *Landers v. B. F. Goodrich Co.*, 369 S.W.2d 33 (Tex.1963). This court is of the view that an action for invasion of privacy and for misappropriation survives under Texas law.

Texas had long followed the *lex loci delecti* choice–of–law rule with respect to torts but shortly before the trial of this case the Texas Supreme Court reconsidered and rejected that rule in favor of the most significant relationship test of the Restatement (2d) of Conflict of Laws § 145. *Gutierrez v. Collins*, 583 S.W.2d 312 (Tex.1979).

The particular issues in conflict are the survivability of Heloise's claim for damages for pain and suffering and her cause of action for invasion of privacy and misappropriation of her name and likeness. Section 167 of the Restatement deals specifically with the survivability of a tort cause of action and adopts § 145's most significant relationship test. Section 153 of the Restatement deals specifically with rights and liabilities arising from a single multistate publication that constitutes an invasion of privacy and in that context uses the same most significant relationship test as § 145. However, § 153 advises that "[t]his will usually be the state where the plaintiff was domiciled at the time if the matter complained of was published in that state."

Sections 145 and 153 state that the most significant relationship test is to be applied with respect to certain criteria listed in § 6 of the Restatement. Section 6 suggests a consideration of several factors including the needs of the interstate system, the relevant policies of the forum state and of other interested states and the relative interests of the states in the determination of the particular issue, certainty, predictability, and uniformity of result, and the ease in determination and application of the law to be applied.

In this case, Heloise was domiciled in the State of Texas at the time of the alleged wrongful acts and at the time she filed suit in this court presenting the claims now pursued by her executor. Shaklee was at all times a California corporation but sells its products and published the materials objected to in every state of the Union including Texas. Although Heloise no doubt suffered injuries on a national level, this court would conclude that those injuries weighed most heavily in Texas. The pain and embarrassment suffered by Heloise when she was accused at a California social occasion of endorsing Shaklee does not change that balance. Heloise was in California for only a short time and did not actually see any of Shaklee's publications until she was back at home in Texas.

Especially significant is the fact that before her death, Heloise filed this lawsuit in this court sitting as a Texas court for purposes of this diversity case. The traditional choice–of–law rule with respect to revival of an action has been to apply the law of the forum on the ground that the forum state has a greater interest in whether to terminate a lawsuit to which its jurisdiction has attached than it would in whether a cause of action should survive when death precedes the filing of suit. Restatement (2d) of Conflict of Laws § 167, Comment d.

■ Based on the above considerations, this court concludes that Texas law should govern Heloise's cause of action for invasion of privacy and her right to recover the specified items of damages.

## IV. Invasion of Privacy

### A. Constitutional Privilege

■ Shaklee contends that as Heloise was a public figure, she must prove knowledge of falsity or reckless disregard for the truth in order to satisfy the standards announced in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) as made applicable to invasion of privacy claims in *Time, Inc. v. Hill*, 385 U.S. 374, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967). There is one obvious problem with Shaklee's argument. Heloise's theory of recovery for invasion of privacy through misappropriation of her name and likeness does not depend on any element of falsity in the

sense involved in *Time, Inc. v. Hill, supra.* As the Supreme Court recognized in *Zacchini v. Scripps–Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), invasion of privacy is really a grouping of four distinct torts only one of which, the "false light" doctrine, was involved in *Time, Inc. v. Hill.* In *Zacchini*, the Court held that no constitutional privilege existed for a television station's misappropriation of Zacchini's performance as an entertainer. Heloise's right to prevent misappropriation of her name and likeness for commercial purposes is the same right discussed by the Court in *Zacchini.* Accordingly, this court rejects Shaklee's claim of privilege.

**B.** *Misappropriation of Heloise's Name and Likeness*

■ Misappropriation of one's name and likeness for commercial purposes was the first form of invasion of privacy recognized by the courts. *Pavesich v. New England Life Ins. Co.*, 122 Ga. 190, 50 S.E. 68 (1905). Since *Pavesich* was decided, the vast majority of states have made such conduct actionable either by statute or court decision. Texas joined with the majority when the Supreme Court of Texas decided *Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973). In the subsequent case of *Kimbrough v. Coca-Cola/U.S.A.*, 521 S.W.2d 719 (Tex.Civ.App. 1975), the court of appeals recognized that form of invasion of privacy that is at issue here, misappropriation. To prove a cause of action for misappropriation, a plaintiff must show that his or her personal identity has been appropriated by the defendant for some advantage, usually of a commercial nature, to the defendant. W. Prosser, *The Law of Torts* § 117 (4th ed. 1971).

■ There is no dispute in this case that the publications caused by Shaklee were used as a promotional scheme to enhance Shaklee's sales. That use is for a commercial purpose. Further, there is no dispute that the advertisements in the *Shaklee Survey* and on the rear cover of the book identified the plaintiff, Heloise. Shaklee contends that the *Survey* advertisements and the language used on and in the book

did not constitute an endorsement of Shaklee or Shaklee products but were intended solely to identify and sell the book authored by Heloise. This court would agree with the legal premise upon which Shaklee bases this argument, i. e., that one who legally obtains the rights to sell a book has a right to use the author's identity as such to advertise the book for sale. *See, Gee v. CBS, Inc.*, 471 F.Supp. 600 (E.D.Pa.1979). However, the court rejects Shaklee's factual argument. The February 1973 *Shaklee Survey* advertisement was a very clever and ingenious device to link Heloise as a person to Shaklee and Shaklee products, as opposed to a mere attempt to sell a book authored by her. The headline, "Welcome a new Shaklee Woman, Heloise," does not refer to Heloise's book; it refers to her person. This reference to her as a "Shaklee Woman," taken in the context of a magazine whose theme is to honor the "Shaklee Woman," described elsewhere in the magazine as an important part of the Shaklee organization, is highly objectionable. Elsewhere in the advertisement readers are told that Heloise "will soon be helping you to open doors and make more sales with Shaklee." The crux of the advertisement is that Heloise has joined with Shaklee by making her book available with "special Shaklee products tips" printed in the text.

On the rear cover of the book, as a part of a Shaklee advertisement of its three main product lines, the reader is told that Heloise is the heroine of the household and that "Heloise and Shaklee all around the house just naturally make your day easier!" The joining of Heloise and Shaklee together in an advertisement for Shaklee products goes far beyond the lawful use of Shaklee's rights to Heloise's book.

The court is of the opinion that each of the above constituted an appropriation of Heloise's identity for Shaklee's commercial benefit. Said uses exceed those uses of an author's name which a seller of the author's book can legitimately claim.

Shaklee has contended that since the *Shaklee Surveys* were distributed only to Shaklee's 237,000 to 240,000 distributors,

rather than to the public at large, the legal consequences of its conduct should be different and that somehow legal liability should be avoided. The court is of the opinion that associating Heloise, as a person, with Shaklee is still a misappropriation even if, as Shaklee alleges, the association was made known only to persons within the Shaklee organization. The court finds that these Shaklee distributors are more than mere in–house employees of Shaklee and that they are engaged in their independent business selling Shaklee products. They are also users and consumers of the same. The *Shaklee Survey*, as a magazine, obviously attempts to sell these distributors on the quality of Shaklee and its products. Thus, Shaklee enjoys a commercial benefit by linking itself with Heloise in the minds of its distributors.

The *Shaklee Survey* containing the objectionable advertisements was at a minimum mailed, one each, to Shaklee's approximately 240,000 distributorships. Most of these distributorships are husband and wife teams; therefore the advertisements reached far more than 240,000 people–perhaps as many as 480,000. In addition, it is likely that these magazines were shown to customers and prospective distributors, as well as to Shaklee's own people.

There were 100,050 copies of the books published. Under their agreement, Shaklee provided address labels for those distributors who had ordered books and the publisher shipped the books directly to those named. The shipping records reflect that 900 books were shipped directly to Shaklee; the rest were apparently shipped directly to the distributors who had ordered them. Shaklee submitted records of moneys received for Heloise's books that reflect that only approximately 93,000 books were sold to distributors as of March 1974. Shaklee also represented to the court, in response to a subpoena duces tecum, that it no longer has possession of any books and does not know what became of them. From the above the court can conclude that well over 90,000 of these books were distributed to the public. These books are of a kind that will not quickly pass out of circulation.

They will be kept as reference books for a period of years and thus will over time reach an ever widening and expanding group of people.

## V. Unfair Competition, Trademark, and Tradename Infringement

Heloise contends that the same acts which constitute a misappropriation of her name constitute unfair competition and trademark and tradename infringement. Trademark and tradename infringement are specific forms of the common law tort of unfair competition. Unfair competition usually involves situations where a defendant has passed off his goods or services as those of the plaintiff. *Volkswagenwerk Aktiengesellschaft v. Rickard*, 492 F.2d 474 (5th Cir. 1974). But the underlying principle of the tort is that one should not be permitted to use another's good will with the public to gain a competitive advantage in the market. *See, Boston Pro Hockey Ass'n. v. Dallas Cap & Emblem Mfg. Co.*, 510 F.2d 1004 (5th Cir. 1975); *Kentucky Fried Chicken v. Diversified Packing*, 549 F.2d 368 (5th Cir. 1977). Thus, the traditional formulation of the tort, *i. e.* passing one's goods off as those of another, has not defined its parameters. The courts have said that any practice which may mislead customers into believing that the product of the defendant is endorsed by or somehow connected to the plaintiff falls within the parameters of the tort. *Kentucky Fried Chicken v. Diversified Packing, supra; Allstate Ins. Co. v. Allstate Inc. Co.*, 307 F.Supp. 1161 (N.D.Tex.1969). In accordance with the above reasoning, the courts have held that competition between the plaintiff and defendant is unnecessary to show unfair competition. *Allstate Ins. Co. v. Allstate Inc. Co., supra.*

Shaklee has contended that, under Texas law, an intent to deceive the public is an element of the tort of unfair competition citing *Prudential Ins. Co. v. Prudential Title Co.*, 189 U.S.P.Q. 617, 620 (S.D.Tex.1976). In *Prudential* the court stated that it "appeared" that intent was required by Texas

law. Although the basis for that conclusion is unclear, it appears that the court found this "appearance" from the statement of the law of unfair competition in *Douglas v. Taylor*, 497 S.W.2d 308 (Tex.Civ.App.1973). The court said that unfair competition may result from the use of a name where that use is "reasonably calculated to deceive." The court took that language from *Harrelson v. Wright*, 339 S.W.2d 712 (Tex.Civ.App. 1960) which was quoting from 87 C.J.S. Trade–Marks, Trade–Names, and Unfair Competition § 92 at 325–329. The crux of all these discussions and the point of the language used was that a plaintiff need not prove actual confusion or deception on the part of buyers but need only show that the practice objected to was reasonably calculated to deceive. Elsewhere in the paragraph the test is stated as requiring that deception be the natural and probable result of the practice. It is clear from a reading of the entire § 92 that the author did not intend to infer that intent was an element of the tort. Neither did the Texas courts in *Harrelson* and *Douglas* use that language in such a manner. Rather we think that the decisions in *Volkswagenwerk Aktiengesellschaft v. Rickard, supra*, and *Oliver Gintel, Inc. v. Koslow's, Inc.*, 355 F.Supp. 236, 239 (N.D.Tex.1973), correctly state the Texas law on this subject; intent is not an element of the tort of unfair competition in Texas.

Thus, if Heloise has shown that Shaklee's promotional material in its magazine and in the book created a reasonable likelihood that readers would be confused or deceived into believing that Heloise was somehow closely connected with Shaklee or that Heloise had endorsed Shaklee or Shaklee products, then Shaklee has committed the tort of unfair competition.

■ Had Shaklee merely offered the book *All Around the House* for sale and identified Heloise as the author, Shaklee would have violated no rule of law. But as already demonstrated in Division IV(B) of this opinion, Shaklee was not content with that proper use of Heloise's name. Shaklee's advertisements and additions to the book itself, as discussed in Division IV(B) give rise to the reasonable likelihood that readers will believe that Heloise is a "Shaklee Woman", *i. e.* a part of the Shaklee organization and that Heloise endorses Shaklee products. Shaklee did seek to capitalize on Heloise's good will and that constitutes unfair competition.

Although not necessary to a finding of unfair competition, the court also believes that Shaklee intended to create the extra–legal inferences which its promotional materials create. This finding is based on a reading of those materials and on the admission by Shaklee's Editor of the *Shaklee Survey* that the advertisements which were prepared for the *Survey*, and the book itself, were not well received by the distributors because they were uncomfortable with persons outside Shaklee endorsing or promoting their products. Shaklee's intent is probative of the existence of unfair competition. *See Kentucky Fried Chicken v. Diversified Packing, supra.*

Infringement of trademark or tradename are but narrower aspects of the tort of unfair competition. The only requirement is that the defendant have achieved the results condemned by the more general tort by the misuse or appropriation of the plaintiff's trademark or tradename. *Kentucky Fried Chicken v. Diversified Packing, supra.* Since the court has already found that Shaklee committed unfair competition, there is no need to investigate the further question whether Heloise has acquired a trademark and whether she or King Features owns it.

## VI. Copyright

Heloise alleges that Shaklee's addition of the advertising materials to her book infringed her copyright in the book. The first issue to be dealt with is whether Heloise has standing to assert a claim for damages under the copyright laws.

■ The copyright of the book is registered in the name of King Features. The plaintiff, Heloise, cites cases which hold that an equitable owner of a copyright has

standing to sue for infringement. *See, e. g., Bisel v. Ladner*, 1 F.2d 436 (3d Cir. 1924); *Ted Browne Music Co. v. Fowler*, 290 F. 751 (2d Cir. 1923); *Manning v. Miller Music Corp.*, 174 F.Supp. 192 (S.D.N.Y.1959); *Schellberg v. Empringham*, 36 F.2d 991 (S.D.N.Y.1929); *Hoffman v. Santly–Joy, Inc.*, 51 F.Supp. 778 (S.D.N.Y.1943). In addition, Heloise asserts that, under its contract with King Features, ownership of the copyright reverted to her at the expiration of the 1965 contract prior to the acts of infringement alleged in this case.

The court is of the opinion that the end of the 1965 contract did not occasion the reverter of King Feature's rights in the copyright. The 1965 contract states that "[s]uch copyright will be assigned to you at the termination of all contractual relations between you and Syndicate." "[A]ll contractual relations" had not ended between Heloise and King Features at the time of the alleged infringement as the 1972 contract between these parties was then in full force and effect. The court must, therefore, determine from the contract in effect at the time of the alleged infringement whether Heloise had an equitable ownership in the copyright. Under the 1972 contract, Heloise granted King Features "the sole and exclusive book, . . . rights . . . in all languages, in and to any and all of said material, including said title, throughout the world . . . ." The contract reserves to Heloise the right to royalties, the right of approval as to the use of any of her materials for "toy, novelty, commercial, and merchandising" purposes, and the right of approval as to the use of any of her materials in connection with "any theatrical or motion picture production." It postpones for future agreement the terms of any sale or license of television or radio rights, and provides that at the end of this contract all copyrights held by King Features would be assigned to Heloise. The court is of the opinion that under all the facts and circumstances of Heloise's relationship with King Features, especially the right to assignment of the copyrights at the end of the parties' contractual relations, Heloise owned an eq-

uitable interest in the copyright to *All Around the House.*

In addition to Heloise's interest in the copyright, the court notes that Hearst Corporation, the nominal title holder of the copyright in question, is a party plaintiff to this action and in becoming such, adopted Heloise's complaint as its own although it asks for no damages for itself. Thus, all parties with an interest in the copyright are before the court and assert the same claim of infringement against Shaklee. Under these circumstances, Heloise has standing to sue for this alleged copyright infringement. *See Manning v. Miller Music Corp., supra; Schellberg v. Empringham, supra.*

There is very little authority relevant to the question whether Shaklee's addition of advertisements to the printed text of Heloise's book constitutes copyright infringement. Counsel has concluded that the issue is one of first impression. Heloise's counsel has found no authority directly on point but cites cases in which material alterations to or omissions from a work were made by a publisher. These cases recognize that an author has a right to protect the integrity of his work and that unauthorized material changes in the work violate the author's rights even when he has parted with the publishing rights. *See Bonner v. Westbound Records, Inc.*, 49 Ill. App.3d 543, 7 Ill.Dec. 409, 364 N.E.2d 570 (1977); *Chesler v. Avon Book Division, Hearst Publications, Inc.*, 76 Misc.2d 1048, 352 N.Y.S.2d 552 (1973); 18 Am.Jur.2d Copyright and Literary Property § 5.

The court finds of particular interest the reasoning in *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14 (2d Cir. 1976). In *Gilliam*, ABC bought rights to three separate television programs produced by the British Broadcasting Corporation (BBC). The authors of the script for these programs, known collectively as "Monty Python," held the copyright on the script and objected when ABC edited the programs to such an extent that the integrity of the original work was impaired. The court said,

The rationale for finding infringement when a licensee exceeds time or media restrictions on his license–the need to allow the proprietor of the underlying copyright to control the method in which his work is presented to the public–applies equally to the situation in which a licensee makes an unauthorized use of the underlying work by publishing it in a truncated version. Whether intended to allow greater economic expolitation of the work, as in the media and time cases, or to ensure that the copyright proprietor retains a veto power over revisions desired for the derivative work, the ability of the copyright holder to control his work remains paramount in our copyright law. We find, therefore, that unauthorized editing of the underlying work, if proven, would constitute an infringement of the copyright of that work similar to any other use of a work that exceeded the license granted by the proprietor of the copyright.

*Gilliam v. American Broadcasting Companies, Inc., supra* at 21.

The two main points in the *Gilliam* reasoning which are persuasive to this court are that a licensee infringes a copyright by exceeding his license and that an author should have control over the context and manner in which his or her work is presented.

 Recognizing that this issue is one of first impression, this court finds that the addition of advertising material to the text of a book, as was done in this case, was an infringement of the copyright if the addition was done without authority. Whether Shaklee had authority is the next inquiry. Shaklee contends that King Features consented and authorized the additions of advertisements. Mr. Ted Benjamin testified that he told a King Features employee, Gerry Mulford, one of two persons he normally called in such matters, that Benjamin Company and Shaklee intended to use advertising inserts in the same way as they were used in the Sherwin–Williams books. This reference was to a previous premium sale of two of Heloise's books to the Sherwin–Williams Company which included boxed advertisements inserted into the text in much the same manner done by Shaklee. Mr. Mulford expressed no objections to Mr. Benjamin. This conversation occurred prior to the delivery of the books to Shaklee. Also relevant to the question of King Features's consent is the course of dealing in which similar inserts had been used. This course of dealing included at least three Heloise books prior to the Shaklee edition. From the above, the court concludes that Hearst, through King Features, consented to and authorized Shaklee's use of advertising inserts.

However, this does not conclude the matter because we must consider Heloise. She never consented to any portion of the Shaklee promotion. She was totally ignorant of the sale and its surrounding facts until she was presented with a *fait accompli*. Heloise was not aware of any of the past insertions of advertising material into her books with the exception of one unrelated occurrence in which a cigarette advertisement on a separate sheet was bound into the book. She promptly objected to that advertisement. The court sees no basis for finding express or implied consent by Heloise to the insertion of these advertisements by Shaklee. Under the contract between Heloise and King Features, the use of Heloise's book in connection with a commercial venture such as the sale to Shaklee required Heloise's approval. Her approval was not obtained; therefore, the insertions were made without her authority. The court finds that Mulford had authority, by his silence, to consent on behalf of King Features and Hearst to the use of said inserts, but that neither he nor King Features nor Hearst had authority to consent on behalf of Heloise.

Accordingly, the court finds that Heloise's copyright was infringed by Shaklee's insertion of the boxed advertisements. The non–innocuous character of these inserts is attested in a memorandum of August 1, 1973 (Pl.Ex. No. 34) from one top executive of King Features Syndicate, Neal B. Freeman, to his companion top executive, Mr. John Wright, reading as follows:

I am deeply disturbed by this premium for Shaklee. Not only the back cover but *the inserts at the end of each chapter indicate that Heloise is approving the Shaklee products*. This is not only contrary to our long–standing policy on the matter, but runs afoul of our agreement with Heloise that we will not make any commitments of this kind without her specific approval. Please give me whatever information you can develop on how this situation occurred. We will be hearing frequently and loudly from Heloise– and I can't say I blame her. (emphasis added)

For our holding of copyright infringement it is not necessary that we adopt Mr. Freeman's opinion that "the inserts at the end of each chapter indicate that Heloise is approving the Shaklee products." Under that theory the inserts alone would amount to misappropriation.

### VII. Damages

### A. The Measure of Damages

Heloise has asked for $2,000,000 in actual damages for invasion of privacy, $5,000,000 in special damages as the value of her endorsement, $350,000 in mental and physical pain and suffering, and $5,000,000 in exemplary damages. The above list apparently includes damages for all of Heloise's theories–misappropriation, unfair competition, and copyright–but the plaintiff has not sought further to itemize the elements of the claimed award nor specifically to discuss what recovery each theory can support. The court will, therefore, first delineate the measure of damages on each theory.

■■■ For invasion of privacy through misappropriation, a plaintiff may recover general damages plus any special damages which are proven. In addition, exemplary damages can be awarded under the same standard applicable to any tort. *See Manville v. Borg–Warner Corp.*, 418 F.2d 434 (8th Cir. 1969); W. Prosser, *Law of Torts* § 117 at 815 (4th Ed. 1971). As special damages, Heloise claims the value of her endorsement had it been sold on the market for the uses to which Shaklee put it. The court is of the opinion that such value is properly recoverable. Such is the value by which Shaklee has been unjustly enriched. *See Hirsch v. S. C. Johnson & Son, Inc.*, 90 Wis.2d 379, 280 N.W.2d 129 (1979); Prosser, *supra.*

■■■ The essential wrong perpetrated by Shaklee in connection with the unfair competition claim was the appropriation of Heloise's good will in her name. That wrong is the same wrong recovered for under the invasion of privacy–misappropriation theory. The court is of the opinion that recovery of the value of Heloise's endorsement can also be based on the theory of unfair competition, although only one recovery can be had. *See Boston Pro Hockey Ass'n. v. Dallas Cap & Emblem Mfg. Co.*, 597 F.2d 71 (5th Cir. 1979). Heloise never claimed any other item of damages under the unfair competition theory.

■■■ The plaintiff did discuss the damages awardable for copyright infringement. Under the law in effect at the time of the wrongful acts, an infringer was liable for any damage suffered by the copyright proprietor and for any profits made by the infringer. 17 U.S.C.A. § 101(b).

### B. Findings of Damages

Having set out the applicable measures of damages, the court now turns to its fact–finding responsibility. Each element of the damages will be taken in turn.

### 1. Value of Heloise's Endorsement

Heloise was a newspaper columnist whose column was carried in some 580 to 600 newspapers with millions of readers. She had widespread name recognition and, due especially to the neutrality established by her refusal to endorse products or even to mention brand names in her column and to her verification of hints published by her, enjoyed a high level of credibility. She was undoubtedly the national leader in her field. From her status, it is clear that her name had some substantial value for endorsement purposes.

The court has been presented with a rather difficult task because of the extreme disagreement over values presented by the three expert witnesses. The plaintiff's experts produced figures of $5,000,000 and $3,000,000. The defendant's expert concluded that, at most, the value could be $25,000. Therefore, scrutiny of these experts' testimony is warranted at this point.

Mr. David Witts has been an attorney since 1945. He has represented numerous clients on both sides of the field of advertising and endorsements. His experience has included negotiating the price of endorsements. Many of his celebrity clients have been national sports figures. He has never represented an author in the endorsement field though he has represented at least two in negotiating contracts to write for magazines or newspapers. In his opinion, a buyer of an endorsement looks for credibility and something to set off his product from the competition. Mr. Witts conducted a study of Heloise and concluded that an endorsement buyer would be interested in her because of her thirty million odd readers located in this country and abroad, her "mail to the tune of 100,000 a week," and her credibility. He further based his opinion on the nature of the book as a reference book which will be used over a number of years—unlike a television commercial which has a relatively short period of exposure. He considered the *Shaklee Survey* as a sales tool exposed to customers and prospective distributors as well as the existing Shaklee distributors and as having a somewhat continuing usefulness. Based on the above, Mr. Witts valued Shaklee's use of Heloise's name at $1,000,000 annually to be repeated over a five–year period. Mr. Witts adopted the five–year period because he felt that the benefits of the endorsement would continue beyond one year but not as long as ten years.

Mr. Murphy Martin is presently the manager of a city chamber of commerce but spent twenty–five years working in radio and television news and advertising. In 1954 he owned and operated a small local advertising agency. Most of his experience has been as a news reporter for television and radio. Over the years, he has himself had occasion to sell his own endorsement or services for advertising purposes, especially in narrating commercials. He has been close to others who did the same. However, he has never negotiated a national contract except for himself and has not bought or sold endorsements for products other than his own. Mr. Witts listened to the trial testimony and apparently based on that found that Heloise's name had a value because of her credibility. He believed that merely associating her name with Shaklee had a value even without a direct endorsement. He also thought that the expected continuing use of the books and *Shaklee Survey* was important to the value of the endorsement. Mr. Witts valued the endorsement appropriated by Shaklee at $3,000,000.

The defendant's expert, Mr. A. Chandler Warren, is an attorney specializing in the entertainment and communications field. He spent eight years in the legal department of a large advertising agency, Young and Rubican, and during that employment dealt with advertising and endorsements. He spent three years in the casting department negotiating endorsement contracts on "overscale" talent. Among those celebrities with whom Mr. Warren has dealt are numerous actors, actresses, and singers. His representation was always on the buyer side during his employment with Young and Rubican. He is now in private practice spending most of his time negotiating contracts in the entertainment and advertising field, which negotiations include both the buying and selling of endorsements. He has never dealt directly with premium books. He has represented one nationally known cookbook author who sold her endorsement for use in television and print advertisements. Mr. Warren had never heard of Heloise before his involvement in this case. However, he sat through the trial, looked through her books, and talked to a few people. He did not read any of the magazine articles which gave Heloise's background. He assumed that Heloise had 30,000,000 readers a day and that 230,000

*Shaklee Surveys* were distributed throughout fifty states. However, he considered the *Shaklee Survey* an in–house organ of Shaklee. He used as a comparable, the not–less–than $54,000 over two and one half years that his cookbook author–client received in 1967 for twelve, fifteen or twenty television advertisements and two or three print advertisements and the $15,000 or $20,000 she received later for two or three television commercials and one–print advertisement. Based on the above, Mr. Warren valued a "full, unqualified endorsement" by Heloise at not over $5,000 in the *Shaklee Survey* and at not over $15,000 to $20,000 for the back of the book. It should be noted that Mr. Warren testified as an expert that the uses made by Shaklee of Heloise's name were not endorsements.

 An evaluation of the above evidence leads to the following conclusions. Mr. Martin's experience is enough for this court to accept his opinion that due to Heloise's credibility, her endorsement would have some value; however, Mr. Martin's experience in negotiating prices for endorsement is so limited as to weaken his opinion of the value of the appropriated endorsement. Mr. Witts and Mr. Warren have substantial experience in the field of buying and selling product endorsements. Their testimony must provide the basis of the court's finding of value. The court finds the underlying factual basis of Mr. Witts' opinion to be accurate except on one point. Mr. Witts stated that Heloise received 100,000 letters a week. According to Ms. Cruse, the column actually received 4,000 to 5,000 letters per month on average, though during some months probably 100,-000 letters were received. The court does agree that the fact that Heloise's column is carried in 580 to 600 newspapers across the country and abroad supports an inference that the column is exposed to millions of people and that 30,000,000 readers is a reasonable inference. The court also agrees with Mr. Witts' assessment of Heloise's credibility, the characterization of the book as a reference book intended for continuing use and that the *Shaklee Survey*

is a bit more than an in–house organ. Mr. Warren similarly based his opinion on Heloise having 30,000,000 readers a day. One problem which the court sees with Mr. Warren's opinion is his use of the cookbook author's endorsement contracts in 1967 or thereabouts as comparables. It does not appear that Mr. Warren adjusted his comparison of figures to account for the differences in the market place of 1967 and 1973. For the above reasons, the court is convinced that Mr. Witts' value is too high and that Mr. Warren's is too low. At the same time, Mr. Warren's experience seems more closely attuned to the circumstances of this case as Mr. Witts' experience has been primarily with sports figures while Mr. Warren's experience has been more general. Therefore, the court is inclined to the view that the actual value is closer to Mr. Warren's assessment than to Mr. Witts'. After a consideration of all the facts and circumstances of the case, the court determines that the value of the endorsement and use of Heloise's name appropriated by Shaklee was $75,000.00.

### 2. General Damages for Invasion of Privacy

The evidence relevant to the issue of general damages demonstrates that Heloise suffered some amount of mental and physical pain and suffering. Heloise's deposition testimony recounted her reactions when she first learned of the Shaklee promotion and when she first saw a copy of the February 1973 *Shaklee Survey*. While attending a social occasion in Los Angeles, she was confronted by some person with the fact of the endorsement in the *Shaklee Survey*. Said fact became the subject of discussion among several people then present. Heloise was "humiliated," "shocked to death," and became very angry at the news. She became so upset that she suffered discomfort that necessitated her taking heart pills. A few weeks later, Heloise received a copy of the February 1973 *Survey* and "nearly had a heart attack and called Kellis, my law-

yer." Again Heloise was so agitated that she "took nitro."

Heloise's physician, Dr. Hernandez, testified that Heloise had a heart condition and arteriosclerosis, but that for the first five or six years after his first seeing her as a patient in 1968 she saw him only three or four times a year and was asymptomatic. Her treatment centered on prevention rather than the alleviation of any symptom. In late summer or early fall 1973, Heloise came to see him with chest pains and was very upset about a serious problem relating to her business. This visit corresponds with and the court finds that it occurred shortly after Heloise learned about the Shaklee promotion. After this visit Heloise contacted Dr. Hernandez with additional complaints of chest pains during periods of emotional upset. Dr. Hernandez testified that her symptoms appeared to be a "lot more frequent and more severe when she was emotional." He thought that it was probable that her emotional state was a contributing cause of her chest pains.

Much of the remaining testimony related to Heloise's mental and physical reactions to Shaklee's conduct and is subject to various evidentiary objections by Shaklee. The principal objections were to testimony by Ponce Cruse, Heloise's daughter and were founded upon the Texas Dead Man Statute, Tex.Civ.Stat.Ann. Art. 3716. Recognizing the possible validity of these objections, counsel for plaintiff withdrew all of Ms. Cruse's testimony relating conversations with her mother. Counsel apparently still maintains that Ms. Cruse's observations of, as opposed to conversations with, her mother are not "transactions" to which she cannot testify. In lieu of Ms. Cruse's live testimony, plaintiff's counsel offered a short portion of her deposition testimony which had been taken before Heloise's death. Shaklee objected to the deposition on the Dead Man Statute grounds and on the grounds that it could not be admitted because Ms. Cruse was present and availa-

ble as a witness. F.R.Civ.P. 32.[2] Another objection, based on hearsay, was registered by Shaklee as to Dr. Hernandez' testimony relating statements made by Heloise specifying the cause of her emotional distress.

■ The court does not feel that it is necessary to resolve these evidentiary points. Based solely upon the testimony of Heloise by deposition and upon the unobjected-to portions of Dr. Hernandez' testimony at trial, the court finds that Heloise suffered and was caused significant emotional distress and mental anguish which in turn contributed to physical pain in the form of recurring episodes of chest pain. Shaklee's conduct was a contributing proximate cause of this mental and physical pain and suffering which occurred periodically between the time of Shaklee's conduct and Heloise's death on December 28, 1977. On the basis of this evidence, the court awards to the plaintiff $25,000.00 as general damages for invasion of privacy through misappropriation.

### 3. Exemplary Damages

■ The court is of the opinion and finds that Shaklee's conduct in using Heloise's name was intentionally and cleverly calculated to produce the inference that Heloise was associated with, approved, and endorsed Shaklee and Shaklee products. This intention is easily discerned from reading the offending materials authored by Shaklee. In addition Ms. Curran, who authored the Shaklee Survey materials, gave the court a hint at her motives when she explained that the reason why the Heloise book promotion was not well received was that the distributors "as a rule have never felt comfortable with anybody outside the organization promoting their product or endorsing them." Such intentional conduct cannot be allowed to go unpunished and undeterred. Therefore, this

---

2. But see, Hart v. Friedman, 29 F.R.D. 2 (E.D. Pa.1961), in which the court admitted deposition testimony over these objections.

court awards $35,000.00 as exemplary damages.

### 4. *Profits*

■ For copyright infringement, Shaklee is liable for the profits which it made on the book. As already discussed in Division IV(B) of this opinion, the amount of profits is in dispute. Shaklee's cost was $42,659.27. Benjamin Company caused 100,050 books to be published and delivered to the order of Shaklee. Only 900 books were received by Shaklee directly from the publisher; the rest were shipped directly to Shaklee distributors. However, Shaklee presented testimony that some distributors returned books either because they received unordered books or because they were dissatisfied with the promotion. A Shaklee exhibit showed total cash receipts for book sales from January 1, 1973 through March 1974 of $46,554.00. As each book was sold for 50 cents, that cash figure represents the sale of 93,108 books. The court does not feel that the evidence is sufficient to establish what, if any, profits were made over and above those made on the sale of the 93,108 books. Accordingly, the court awards as profits $3,894.73.

### VIII. *The Counterclaim*

The essence of Shaklee's counterclaim against Hearst is that Hearst should indemnify Shaklee for all damages for which Shaklee is held liable related to the Heloise book promotion. The basis for this claim is that if Hearst had complied with its contract with Heloise by seeing to it that Heloise's right of approval was recognized and that her approval or disapproval had been obtained, Shaklee would have violated none of Heloise's rights.

The first matter needing attention is whether Heloise had a right of approval for commercial and merchandising uses of her books. As should be obvious by this court's references to this right in other portions of this opinion, this court is of the opinion that Heloise did have such a right of approval. Under the 1972 contract, Heloise granted to King Features "(c) all toy, novelty, commer-

cial, and merchandising rights ... in and to any and all material relating to HINTS FROM HELOISE ... but subject to the following: such must be presented to Heloise in writing and should Heloise elect to refuse to approve them her disapproval must be in writing in fifteen (15) days from receipt of notice." The book *All Around the House* is "material relating to HINTS FROM HELOISE" and is subject to Heloise's right of approval.

The court believes that the proper resolution of the counterclaim requires that it distinguish the wrongs committed by Shaklee. The wrong which constitutes copyright infringement consists solely of the act of inserting the boxed advertisements into the book. That wrong does not depend on the context of the advertisements but on their existence. The wrong which constitutes invasion of privacy, misappropriation and unfair competition consists of the publication of the substantive context of the *Shaklee Survey* advertisements and of the advertisement on the rear cover of the book which convey the idea that Heloise approved and endorsed Shaklee and Shaklee products. Thus it can be concluded that the wrongful acts can be separated for purposes of the counterclaim.

Hearst's conduct as it relates to the counterclaim consisted essentially of its consent to at least a portion of Shaklee's wrongful conduct. The evidence shows that Hearst through King Features, pursuant to its authority from Heloise, gave go-ahead permission at the preliminary stages to the premium sale. Pocket Books, under its contract with Prentice-Hall, was required to obtain from King Features such go-ahead permission. Subsequently, King Features in the person of Gerry Mulford became aware that Shaklee contemplated the use of boxed advertising inserts and did not object. Considering that silence along with King Features' previous dealings with similar premium sales and inserts, the court finds that King Features consented to and authorized the insertion of the boxed adver-

tisements. However, that is not to say that King Features ever agreed to, accepted, or acquiesced in those of Shaklee's writings which constitute the invasion of privacy, misappropriation, and unfair competition. King Features had no knowledge of the content of the inserts, the back cover advertisement or the *Shaklee Survey* materials. The actual copy for the Shaklee additions to the book were not shown to King Features until after publication. King Features thus was never apprised of Shaklee's intention to use Heloise's name in a wrongful manner. To say that King Features knew that her name, as author, would be used is not to say that King Features knew that her name would be used wrongfully. As already mentioned in Division IV(B) of this opinion, a more limited use of Heloise's name by merely identifying her as the author of the book would have been completely unobjectionable.

■ The court is of the opinion that when Hearst through King Features knowingly consented to and thus authorized the insertion of boxed advertisements into the book, which this court has found to constitute copyright infringement, there arose a duty on it to see that Shaklee did indeed have authority for such actions. In other words, Hearst's conduct in not warning Shaklee of Heloise's rights or of securing her permission directly breached this duty to Shaklee which duty was created by Hearst's having given go–ahead permission for the premium sale to Shaklee and then acquiring knowledge of Shaklee's intentions to use such inserts and Hearst's consent and authorization for such use. As between Shaklee and Hearst, Shaklee had no reason to suspect that the use of the insertions were not authorized by those interested in the book. Such insertions had been used in the past and were a major part of Tom Golden's sales pitch to Shaklee. Hearst should, therefore, be held liable for the damages which Shaklee must pay for the infringement of copyright.

■ On the other hand, Hearst should not be held liable for Shaklee's misconduct with respect to misappropriation or unfair competition. The duty which Hearst owed to Shaklee with respect to the copyright issue arose because of Hearst's foreknowledge and authorization of Shaklee's infringing conduct. It was not Hearst's contractual responsibility towards Heloise that created this duty towards Shaklee. Shaklee's wrongful conduct with respect to misappropriation and unfair competition was unknown to Hearst until after the fact. Neither was such misconduct foreseeable by Hearst. Hearst's duty to Shaklee did not extend so far as to prevent misconduct which it had no reason to suspect might occur. While as we note in Division VI the inserts themselves might amount to misappropriation and unfair competition, such a finding is not necessary to the finding of copyright infringement. At any rate, King Features and Hearst had no foreknowledge of the actual contents of the inserts.

■ Shaklee also claims, under the theory of indemnity, a right to recover attorney fees and the costs of defending the action. The court finds that Hearst was never tendered the defense of the small part of this lawsuit for which it is liable. In fact, Shaklee never tendered to Hearst any opportunity to defend with respect to the whole or any part of the lawsuit. Accordingly, Hearst is not liable for any portion of Shaklee's attorney fees and costs. *See, Cooper v. General Dynamics Corp.*, 533 F.2d 163, 170 (5th Cir. 1976).

## IX. Conclusion

Accordingly, judgment on the main case will be entered in favor of the plaintiff, National Bank of Commerce, as executor of the estate of Heloise Bowles and against the Shaklee Corporation, and judgment on the counterclaim will be entered in favor of the Shaklee Corporation and against Hearst Corporation for the amounts specified above. The Shaklee Corporation will bear the costs of this action.

APPENDIX A

# Welcome a new Shaklee Woman

"Heloise" - the nationally-syndicated columnist whose success with household hints has made her a household name - will soon be helping you to open doors and make more sales with Shaklee.

A special edition of her 238-page book "All Around The House With Heloise" is being printed and will contain special Shaklee products tips at the close of each chapter. The front and back covers carry Shaklee messages as well.

Regularly sold on newsstands for 95¢, this edition is available from Supervisors at 50¢ per copy. It has plenty of room for your own Distributor imprint and will serve as a continual Shaklee reminder to the customer.

You can give it away as a "thank you" to good and steady customers, or as a premium with a large sale, or sell it for a fair price to your clientele.

Delivery to Supervisors is scheduled for April, and you should place your advance orders now to be sure you are the first to utilize this great door-opener.

Heloise is a collector of time and work-saving tips that every homemaker can put to use. Her Sunday and daily columns appear in the nation's biggest papers and her fans number in the millions. Readers continually submit their own favorite household tips to her. With the new Shaklee material added to the book, your customers will have even more valuable ideas at their fingertips.

"Heloise" is just one of the many sales helpers being developed to make your selling easier.